UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

MICHAEL W. MCDEVITT,

                          Plaintiff,

         -against-

SUFFOLK COUNTY, SUFFOLK COUNTY POLICE
DEPARTMENT, SUFFOLK COUNTY POLICE
OFFICER GLENN TARQUINIO, in his individual
and official capacities, SUFFOLK COUNTY POLICE
OFFICER ALEJANDRO SANCHEZ, in his individual
and official capacities, SUFFOLK COUNTY POLICE
OFFICERS "JOHN AND JANE DOES # 1-10," in
their individual and official capacities,

                         Defendants.

-----------------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
CV 16-4164 (GRB)(ST)

FILED
CLERK

12:23 pm, Mar 26, 2024

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**GARY R. BROWN, United States District Judge:**

       Presently before the Court are motions by defendants herein seeking post-trial relief

under Rules 50 and 59 from a judgment in favor of plaintiff on his claim for malicious

prosecution as against defendant Police Officer Glenn Tarquinio, awarding an aggregate sum of

$600,000, and against defendant Suffolk County ("the County") for nominal damages based on a

*Monell* pattern, practice, policy or custom.  As to the individual liability finding, the jury's

verdict is well-supported by the evidence.  As to damages, however, the parties agree that

remittitur is appropriate, which is discussed further herein.  Finally, as to the *Monell* verdict, the

evidentiary record does not support the jury's verdict in connection with malicious prosecution,

and therefore the County is entitled to relief in that respect.

*Applicable Standard for Post-Verdict Motions*

Defendants' motions  seeking judgment as a matter of law, a new trial and remittitur are decided based upon the well-established standard for the consideration of such motions in this Circuit as discussed in detail in *Anderson v. Aparicio*, 25 F. Supp. 3d 303 (E.D.N.Y. 2014), *aff'd and remanded sub nom. Anderson v. Cty. of Suffolk*, 621 F. App'x 54 (2d Cir. 2015), which discussion is hereby incorporated by reference.

Against this backdrop, defendants' motions are, in the main, easily dispatched.

*Relevant Facts and Discussion*

The trial in this matter generated an extensive factual record, which is only summarized here as needed for resolution of the pending motions.  In summary, the testimony revealed that defendant Tarquinio responded to a 911 call reporting a disturbance at a residence.  That disturbance related to an ongoing dispute among plaintiff, a tenant, the landlord and a contractor performing work on a residence.  While attempting to investigate the call, the plaintiff, without justification, interfered with Tarquinio's efforts to speak with a witness.  Docket Entry ("DE") 165-4 (herein after "Tr.") 241–42, 275–76, 290–93, 336 (plaintiff acknowledges refusing lawful order to leave).  The jury, therefore, properly found that Tarquinio had probable cause to arrest plaintiff for obstructing governmental administration, thereby rejecting plaintiff's false arrest claim.  *See* DE 144-3 ("Court Ex. 10") at 1.

The jury determined, however, that during the arrest, Tarquinio used excessive force against the plaintiff.  *Id.* at 2.  The witnesses' accounts of their interaction vary, as plaintiff and another witness described a severe, unprovoked attack upon plaintiff by Tarquinio.[1]  Even

---

[1] One witness described observing Tarquinio—at 6'1" and weighing over 300 lbs.—strike plaintiff in excess of 50 times with punches, knees and elbow strikes, while plaintiff testified to "getting punched, elbowed, kneed all the way around the kitchen." Tr 296–97, 336.  This description seems at odds with other evidence of record.  *See, e.g.*, Def.'s Ex. Q & R (hospital records relating to plaintiff showing largely unremarkable injury); Tr. 545–46.  While the

Tarquinio acknowledged that he preemptively struck plaintiff in the face, knocking his glasses to the ground, to gain "the element of surprise." Tr. 61, 142. Thus, while not subject to challenge, the evidence at trial supports the jury's determination that Tarquinio used excessive force against plaintiff. At the same time, the jury determined that plaintiff failed to adequately demonstrate injury from that use of force.[2]

Charges filed by Tarquinio against plaintiff gave rise to a finding of malicious prosecution. The jury found that plaintiff proved by a preponderance of the evidence that Tarquinio lacked probable cause to commence and continue one or more of the three charges with which plaintiff was charged and acted maliciously in doing so—a finding that unquestionably relates to Tarquinio's commencement of second-degree felony assault charges against plaintiff and the resisting arrest misdemeanor charge. In challenging the jury's determination, the County asserts that the evidence cannot support the finding and/or that Tarquinio is entitled to qualified immunity on this point. Initially, the record reveals that Tarquinio signed instruments charging the plaintiff with two misdemeanor offenses: Obstructing Governmental Administration and Resisting Arrest. *See* DE 165-16 at 2; DE 165-18 at 2. On the way to the police station, Officer Sanchez, who took custody of plaintiff while Tarquinio sought medical attention, advised plaintiff to secure $500 to post for bail, giving rise to the inference that plaintiff would be released that day. Tr. 351.

Immediately after plaintiff was booked on the misdemeanor charges, Tarquinio advised him that "there are more charges now, so we ha[ve] to rebook you." Tr. 360. The plaintiff asked

---

jury found Tarquinio employed excessive force during the arrest, it apparently (and understandably) did not credit this testimony regarding the degree of force employed.

[2] It could be argued that, notwithstanding the absence of injury, the jury should have found Tarquinio liable for nominal damages on the excessive force claim. However, plaintiff has not made such a motion, and the issue has been waived.

about posting bail to which Tarquinio responded, "No, you're staying," and then "they refingerprinted [plaintiff and] retook [his] photos again."  Tr. 363.[3]

The additional charge emanated from Tarquinio's consultation with detectives; Tarquinio testified that "[t]hey found a subdivision . . . in the assault section."  Tr. 160.  The charge initiated by Tarquinio was a felony, to wit: "second degree assault upon a police officer," purportedly in violation of Penal Law § 120.05(3).  Tr. 204.

Unlike the instrument charging Obstructing Government Administration, the Felony Complaint charging plaintiff with Second Degree Assault bears little resemblance to the underlying facts.  The statute provides that a person violates that statute when:

> With intent to prevent [ ] a police officer [ ] from performing a lawful duty, by means including releasing or failing to control an animal under circumstances evincing the actor's intent that the animal obstruct the lawful activity of such [ ] police officer, he or she causes physical injury to such [ ] police officer.

N.Y. PENAL LAW § 120.05(3).  The Felony Complaint tracks the statutory language, then sets forth the following:

> The defendant . . . with the intent to prevent a police officer from performing a lawful duty, by means including releasing or failing to control an animal under circumstances evincing the actor's intent that the animal obstruct the lawful activity of such police officer, he caused physical injury to such police officer; in that, with intent to prevent Glenn Tarquinio, a police officer, from performing a lawful duty, namely arresting [plaintiff] for obstructing governmental administration, defendant caused physical injury to P.O. Tarquinio by flailing his arms, pulling away and wrestling with the officer, injuring the officers [sic] lower back, right knee and left elbow that caused substantial pain and required medical attention . . . .

DE 165-17 at 2-3 (text in lowercase for ease of reading).  The Felony Complaint, like the misdemeanor charging instruments, was signed under oath by Tarquinio, though written by detectives with his assistance.  *Id.*; Tr. 39, 97-99, 202, 221–22.  At trial, the evidence established

---

[3] The need to fingerprint and photograph plaintiff a second time almost immediately after completing that process was never explained but gives rise to inferences that further support the jury's determination that Tarquinio acted maliciously in bringing the felony assault charge against plaintiff.

that, despite several references, there was no animal involved in the situation, Tr. 226, nor could

defendants identify any other "means" deployed by plaintiff to injure Tarquinio.  In fact, the

contact between them began when, to get "the element of surprise," Tarquinio slapped plaintiff's

face, knocking plaintiff's glasses off.  Tr. 61, 142.  When asked to describe the physical force

used against him by plaintiff, Tarquinio identified plaintiff as:

> [F]lailing his arms and denying me access to his hands to place them behind his
> back [and] his reluctance to allow me to place him -- place him in handcuffs.

Tr. 196.  The injuries to Tarquinio's elbow, back and knee resulted from his "decision to take

[plaintiff] to the ground."  Tr. 205, 145–46.  Notwithstanding the reference to "wrestling with the

officer" in the Felony Complaint, the record is devoid of any evidence that this occurred.[4]

Eventually, the felony charge and one of the misdemeanors were dismissed; the remaining

charge was resolved through a 60-day adjournment in contemplation of dismissal.  Tr. 375.

Counsel for Tarquinio argues, without much analysis, that the evidence does not support

the jury's finding that Tarquinio lacked probable cause to bring certain charges.  DE 165-9 at 43.

As a fallback position, counsel argues that Tarquinio had "arguable probable cause" for the

felony charge, warranting the application of doctrine of qualified immunity.  *Id.*  These

arguments are based on a severely circumscribed view of the evidence, *i.e.* limiting review of the

record to the account provided by Tarquinio—an account the jury was free to accept or reject.

For example, counsel argues that there was probable cause, or at least arguable probable cause,

to prosecute plaintiff for second degree assault and resisting arrest based upon plaintiff's

"refusing to place his arms behind his back so Tarquinio could handcuff him."  DE 165-9 at 47-

48.  But that purported fact is derived solely from Tarquinio's testimony, while the record

---

[4] The Oxford English Dictionary defines "wrestling" as the "action or exercise of two persons grappling or gripping in a contest of strength and adroitness."  *Wrestling*, Oxford English Dictionary, https://www.oed.com/dictionary/wrestling (last visited Mar. 19, 2024).

contains sworn testimony from two other witnesses that these actions simply did not occur.

Indeed, defendants' mantra throughout these proceedings is that plaintiff resisted arrest and caused Tarquinio injury by "flailing his arms" while Tarquinio was attempting to handcuff him. *See, e.g.*, Tr. 142–44, 196, 225 (Tarquinio testimony). In her summation to the jury, counsel argued that "[a]s a result of . . . his flailing, yes, Officer Tarquinio slapped him in the face knocking his glasses off in order to attain his compliance." Tr. 688. Yet the testimony of Brittany Barton, the 911 complainant, directly contradicts this account:

Q. When you say "covering his face," he wasn't flailing his arms around?

A. No. He was covering his face like this (indicating.)

Q. He wasn't throwing punches back?

A. No, not at all.

…

Q. At any point during this, does Mr. McDevitt flail his arms?

A. No. He's still protecting his face.

Q. And why is he protecting his face?

A. Because he's being hit.

Tr. 244–45. According to Barton and plaintiff, Tarquinio attacked plaintiff without justification and with little provocation, and plaintiff did not resist the arrest. Tr. 241–43, 336–38.

Therefore, to reject the jury's determination, or shield Tarquinio from liability based on qualified immunity, would require the wholesale rejection of the credibility determinations made by the jury, indiscriminate acceptance of Tarquinio's account and complete rejection of the testimony of plaintiff and a corroborating third-party witness. The Court declines counsel's implicit invitation to do so. Thus, Tarquinio's motion for relief under Rules 50 and 59 based

upon the purported existence of probable cause or arguable probable cause warranting the
application of qualified immunity[5] is denied.

*Damages and the Motion for Remittitur*

Based on its findings, the jury determined that Tarquinio was liable to the plaintiff for
compensatory damages of $150,000 and punitive damages of $450,000, for an aggregate total of
$600,000.  Defendants claim that both sums are excessive and seek remittitur reducing the
amount awarded or a new trial under Rule 59.  Plaintiff opposes, but concedes that remittitur is
appropriate and suggests reducing punitive damages to $400,000.  DE 165-21 at 28.

Thus, the parties are agreed on one thing: remittitur is appropriate to some degree.  The
Second Circuit has encouraged trial courts to employ "the least intrusive standard to calculate
remittitur—granting remittitur only to the maximum amount that would be upheld by the district
court as not excessive."  *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 672 (2d Cir. 2012)
(collecting cases).  As set forth below, the Court has endeavored to do so.

*Compensatory Damages*

Defendants challenge the jury's compensatory award of $150,000, claiming that that the
only actual damages articulated by plaintiff consists of attorneys' fees of $30,000.  DE 165-9 at
51.  In some senses, defense counsel is correct, as evidence of out-of-pocket damages emanating
from the malicious prosecution charge is limited to this figure.  In making its argument, though,
defendants' counsel fails to account for an important element of compensatory damages: mental

---

[5] In the circumstances presented here, where the jury found that plaintiff proved that Tarquinio had (1) used
excessive force in connection with the arrest; (2) lacked probable cause in connection with the prosecution and (3)
acted with malice in bringing certain charges—findings well supported by the record—it would seem particularly
unseemly to apply the doctrine of qualified immunity.  "Normally, [ ] the 'plainly incompetent or those who
knowingly violate the law'—those who are not worthy of the mantle of office—[are] precluded from claiming the
protection of qualified immunity."  *Moore v. Andreno*, 505 F.3d 203, 214 (2d Cir. 2007) (quoting *Malley v. Briggs*,
475 U.S. 335, 341 (1986)).

7

pain and suffering sustained by the plaintiff from unwarranted incarceration.

After the filing of the felony complaint, plaintiff was held in jail overnight.  Tr. 367. There is an inference that arises that the filing of a baseless charge may have resulted in an additional period of incarceration, which figures importantly in considering plaintiff's compensatory damages.  As noted, Officer Sanchez, while transporting plaintiff to the police station, suggested that he would qualify for bail by posting $500.[6]  Tr. 350.  That occurred at approximately 2:00 p.m.  Tr. 85.  After both Tarquinio and plaintiff returned from the hospital (each was treated separately), plaintiff was returned to Tarquinio's custody from about 5:15 p.m. until 7:36 p.m.  Tr. 183.  Early in the morning, he was transported to the County Court, where the judge "took [him] right away."  Tr. 369, 550 (plaintiff transported "early in the morning" to court), *id.* at 552 (plaintiff searched at 9:37 a.m. in anticipation of arraignment).  At the arraignment, he was released on his own recognizance.  Tr. 373.  While the precise time of his release is not clear, it can be reasonably estimated that plaintiff's custodial period was needlessly extended from 5:15 p.m. until approximately 11:15 a.m., for a total of about 18 hours.  The emotional impact of 18 hours of incarceration, then, represents the only other competent evidence of compensable damages arising from the malicious prosecution count.

How should the value of 18 hours of additional, unwarranted incarceration be fixed?  In trying to ascertain a reasonable range, the opinion in *Medina v. City of New York*, No. 20 Civ. 797 (VEC)(SLC), 2022 WL 675977, at *8 (S.D.N.Y. Jan. 12, 2022),  *adopted by*, No. 20-CV-797 (VEC), 2022 WL 354662 (S.D.N.Y. Feb. 7, 2022), which draws on the decision in *Francis*

---

[6] It is conceivable that Sanchez was wrong, and the plaintiff would not have obtained bail that day.  However, in an effort to draw inferences in plaintiff's favor and establish a reasonable range for damages calculations, the Court will assume, for the purposes of this opinion, that the filing of the felony complaint by Tarquinio extended plaintiff's time in custody, a fact which Tarquinio implicitly acknowledged.  Tr. 165-4 at 360 ("He said, no, no, no, there are more charges now, so we had to rebook you), *id.* at 363 ("I turned to Tarquinio and I say: I was told I could get bail? He says: No, you're staying.").

*v. City of New York*, No. 15-CV-7997 (VSB)(KHP), 2019 WL 8918743, at *8 (S.D.N.Y. Nov. 12, 2019), proves helpful.  While not a remittitur case, *Medina* involved the improper 18-hour detention of a plaintiff who, like plaintiff here, was not physically harmed in custody and offered evidence of "garden variety" mental anguish[8] that was "limited to the testimony of the plaintiff, [] described in vague or conclusory terms, without presenting evidence of the duration, severity or consequences of the condition, and [with] minimal or no evidence of medical treatment."[9] 2022 WL 675977, at *8 (internal quotations omitted).  The Court in *Medina* adopted a formula from *Francis* that awarded $2,000 per hour (adjusted for inflation) for "loss of liberty" from unnecessary incarceration.  *Francis*, a remittitur case in which the district court endeavored to "remit[] the jury's award to the 'maximum amount that would not be excessive,'" 2019 WL 8918743, at *8 (quoting *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 261 (S.D.N.Y. 2007)), examined the range of reasonable outcomes in a  similar fact scenario and devised the $2,000 per hour figure.  Adjusted for inflation, in the instant case, the *Francis-Medina* formula would yield an hourly damages rate of approximately $2,400—which, for 18 hours, yields an award of $43,200.  This figure could well represent a reasonable award for mental anguish in these circumstances.[10]

However, there are case-specific facts unique to this matter that provide further insight.

---

[8] Even where the trial court found a plaintiff had suffered more than garden variety emotional distress, the Circuit has halved an emotional distress award of $200,000 where plaintiff "was held by the police for only a few hours and was never indicted, convicted, or sentenced."  *Stampf v. Long Island R. Co.*, 761 F.3d 192, 207 (2d Cir. 2014).

[9] While plaintiff offered some testimony about medical treatment, the evidence only related in small measure to the malicious prosecution damages and emanated in much larger respect to prior emotional issues and the fallout from alleged excessive force.  Tr. 381-2; 395ff.

[10] Both *Francis* and *Medina* awarded an additional sum of $10,000 representing emotional damages in addition to the mental anguish while in custody.  *See Francis*, 2019 WL 8918743, at *8-9; *Medina*, 2022 WL 675977, at *8.  The Court finds this unnecessary in the instant case based upon (1) the paucity of evidence concerning plaintiff's post-incarceration emotional damages; (2) the jury's rejection of plaintiff's false arrest claims, meaning that the initial incarceration was warranted, so the award is for a period of ancillary detention, which should be valued differently from a false imprisonment situation, and (3) the case-specific analysis that follows.

As noted, plaintiff paid a criminal attorney approximately $30,000 to defend him against the charges.  Tr. 375.  Added to this, plaintiff testified that he paid between $500 and $600 per year in out-of-pocket expenses for mental health treatment from 2014 through 2023.  Tr. 383.  At $550 per year for nine years, this would amount to an additional $4,500.  From this, plaintiff's counsel concludes that the difference between these two out-of-pocket figures and the amount awarded for compensatory damages constitutes the jury's finding concerning the amount of mental anguish suffered by plaintiff.  Thus, plaintiff's counsel concludes that the jury awarded "$115,000 for emotional distress."  DE 165-21 at 27.

However, this conclusion ignores the nature of the evidence presented and highlights one of the problems faced by the jury in calculating damages.  The trial included presentation of evidence for damages allegedly suffered by plaintiff in connection with his claims of false arrest (which he failed to establish), excessive force (established, but plaintiff failed to establish damages connected therewith) and malicious prosecution.  Because plaintiff failed to segregate the damages arising from these various theories, the evidence of damages was, in the main, inextricably commingled.  Consider the following exchange on plaintiff's direct:

> Q: Can you tell the jury how the processing of these accusatory instruments by Mr. Tarquinio impacted you?
>
> A: I haven't worked as a contractor. I had to get on Social Security disability. I get about $600 a month they give me to live on. Thank God for my brother who helped me out.
>
> . . .
>
> Q: When you say it came to April 2nd that was it, tell the jury, because there's no broken bones here, alright, what happened to you? What changed your life?
>
> A: Well, I can't lift anything heavy. I used to do, you know, demolition. I used to do kitchens and bathrooms. I can't lift kitchen cabinets anymore. I can't get down on my knees and start doing tile, I can't. I can't do it anymore. I can't lift. I'm in pain all the time.

Tr. 376–77.  In this manner, plaintiff's testimony, elicited by his counsel, unfairly conflated compensatory damages arising from the physical injuries he claimed, but failed to prove, arising from excessive force during the arrest with the injuries attributable to the malicious prosecution and resulting extended period of detention.

In particular, plaintiff testified to losses of $75,000 in connection with repairs made to his house, which he claimed he was no longer physically able to make himself.  Tr. 387-88, 671 (counsel arguing this sum to jury).  When asked to provide specific losses arising from his claims, plaintiff testified as follows:

> Q: Can you tell us anything else about the quality of life that has changed after from April 1, 2014 to April 2, 2014, what has changed in your everyday life?
>
> . . .
>
> A: Well, I had a house that I invested in before April. I had gutted the whole thing. 2013 I started redoing the house, all new windows, everything, and then the beating happened. I couldn't work on the house anymore. [] I had to hire people to do what I used to be able to do, put siding on the house, put a new roof on the house. I can't do it, and it cost me $75,000 for a roof and siding.

Tr. 387.  In his next question, plaintiff's counsel defined the $75,000 for repairing the house— along with the $30,000 paid to criminal defense counsel and $4,500 for mental health treatment—as plaintiff's "out-of-pocket costs."  Tr. 387.  Thus, it seems a virtual certainty that the jury included the $75,000 in home repairs in its calculation of compensatory damages  of $150,000.  The problem is, of course, that plaintiff's inability to complete home repairs had nothing to do with the malicious prosecution claim, rather, this item related solely to damages arising from the excessive force allegations, which damages, the jury found, plaintiff failed to establish.

Deducting the $75,000 from the jury's compensatory award leaves a net compensatory

award of $75,000.  As the other specified items of damage, to wit: criminal defense fees and mental health treatment, total $34,500, the resulting award would effectively provide $40,700 for emotional distress-related damages from his additional time in custody.  The $43,200 generated by the *Francis-Medina* formula bears notable similarity to this outcome, confirming the reasonableness of the jury's award on this point.  Thus, assuming plaintiff agrees to remittitur rather than a new trial, the compensatory damages in the matter will be reduced to the aggregate amount of $77,700, consisting of the proven out-of-pocket expenses plus the emotional distress damages calculated using the *Francis-Medina* formula.

*Punitive Damages*

In connection with considering remittitur of a punitive award, the Second Circuit has observed:

> In reviewing an award for punitive damages in *Payne*, we explained that "[n]o objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct." 711 F.3d at 93. Punitive damages "are given to the plaintiff over and above the full compensation for the injuries, for the purpose of punishing the defendant, of teaching the defendant not to do it again, and of deterring others from following the defendant's example." Prosser and Keeton on the Law of Torts § 2, at 9 (5th ed.1984). They "are by nature speculative, arbitrary approximations." *Payne*, 711 F.3d at 93. Despite this arbitrariness, courts "bear the responsibility to ensure that judgments as to punitive damages conform, insofar as reasonably practicable, to [the prevailing norms of the legal system] and are not excessive." Payne, 711 F.3d at 96. [ ]

> The Supreme Court outlined three "guideposts" to facilitate its review of state court punitive damage awards: (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the actual harm inflicted, and (3) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). [ ] Thus, we consider whether Stampf's award for punitive damages is excessive in light of judges' greater familiarity than juries' with norms for punitive damages, federal appellate courts' considerable supervisory authority when reviewing district courts' rulings as to the excessiveness of a jury's punitive damages award, and the three guideposts set forth by the Supreme Court in *Gore*.

12

*Stampf v. Long Island R. Co*., 761 F.3d 192, 209 (2d Cir. 2014). Of course, the situation here is slightly different. As noted, plaintiff agrees to some level of reduction, suggesting that, rather than the $450,000 imposed by the jury, $400,000 would be appropriate. The question before this Court, then, turns on the appropriate amount by which the punitive award should be reduced, rather than whether the punitive award should be reduced. Nevertheless, the *Gore* factors provide important, albeit "non-exhaustive," guideposts. *Jennings v. Yurkiw*, 18 F.4th 383, 390 (2d Cir. 2021).

### 1. *Degree of Reprehensibility*

As the Second Circuit has explained:

> In *Gore,* the Supreme Court noted that reprehensibility is "perhaps the most important" consideration in assessing the reasonableness of an award of punitive damages. 517 U.S. at 575, 116 S.Ct. 1589. There, the Court identified certain "aggravating factors" that are "associated with particularly reprehensible conduct" and contribute to the sense that "some wrongs are more blameworthy than others." *Id*. at 575–76, 116 S.Ct. 1589. Those aggravating factors include: (1) whether a defendant's conduct was marked by violence or presented a threat of violence, (2) whether a defendant's conduct evinced trickery or deceit as opposed to mere negligence, and (3) whether the record supports a finding of intentional malice. *Id.*

*Jennings*, 18 F.4th at 390.

As to the first aggravating factor, the challenged punitive award relates solely to plaintiff's malicious prosecution claim, emanating from acts which, though highly reprehensible, were not "marked by violence or [ ] a threat of violence." *Id.* "The Supreme Court has noted [ ] that physical assaults generally demonstrate a higher degree of reprehensibility than nonviolent crimes." *Patterson v. Balsamico*, 440 F.3d 104, 121 (2d Cir. 2006) (citing *Gore*, 517 U.S. at 575–76). At the same time, however, the jury found that Tarquinio employed excessive force, though found that plaintiff failed to establish any injury emanating therefrom.

These procedural complexities in this malicious prosecution case makes comparable

cases somewhat scarce.  Fortunately, *Lee v. Edwards*, 101 F.3d 805 (2d Cir. 1996) provides a powerful exception.  In *Lee*, although "the jury found Edwards liable for punitive damages on the assault and battery, Lee elected to waive that claim" for tactical reasons.  *Id.* at 810 n.3.  *Lee* noted that "[t]he malicious prosecution entailed little overt violence," while recognizing that "[t]here is, however, an element of real and threatened force that could have aroused the jury," and that although defendant's "decision to charge Lee falsely was implemented merely by an entry on a form, [ ] that act nevertheless had the power to set into motion the coercive apparatus of the state, which is ultimately rooted in a willingness to use force." *Lee*, 101 F.3d at 810. Similar considerations apply here.

The applicability of the remaining aggravating factors is easily determined.  The second aggravating factor—use of deceit or trickery—is clearly applicable.  Tarquinio's invention of a felony charge here was aided by sworn false statements—including references to descriptions in the charging documents of plaintiff's efforts to resist handcuffing and wrestling with Tarquinio—plainly implicating the "trickery or deceit" factor.  *See Jennings*, 18 F.4th at 391 (in considering reprehensible nature of defendant's conduct, the jury "was entitled to consider a record that included falsified charging documents").  False testimonial statements by law enforcement officers represent a pernicious evil.  That Tarquinio continued to testify falsely at trial further establishes the disgraceful nature of his conduct.  *See, e.g.*, Tr. 54-55.  As in *Lee*, Tarqunio's "conduct was marked by malice."  *See* 101 F.3d at 810.  Indeed, the jury not only determined that Tarquinio acted without probable cause in bringing charges—giving rise to an inference of malice—but specifically found that defendant had acted with malice.  *See Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016) ("[A]ctual malice can be inferred when a plaintiff is prosecuted without probable cause."); Court Ex. 10.

14

Thus, Tarquinio's actions were sufficiently reprehensible under *Gore* to justify some level of punitive damages.

2. *Ratio*

Here, the jury's punitive award of $450,000 constituted exactly triple the amount of its compensatory award of $150,000.  It seems likely that this represents something more than a coincidence—the jury attempted to award treble damages.  Having found that the compensatory award should be reduced, it would appear that, for that reason alone, the jury's punitive damages award also warrants remittitur.  *See Tretola v. Cnty. of Nassau*, 14 F. Supp. 3d 58, 86 (E.D.N.Y. 2014) (reconsidering punitive award where compensatory award "has been pared").  The analysis, though, involves more than a formula.  *See Stampf*, 761 F.3d at 210 ("The Supreme Court explained in *Gore* that it could not 'draw a mathematical bright line' between constitutionally acceptable and unacceptable ratios for punitive damages.").

As this Court recently noted, "punitive damages are frequently awarded in small multiples of the amount of compensatory damages."  *Dynamite Mktg., Inc. v. Wowline Inc.*, 2023 WL 8358061, No. 19-CV-3067 (GRB)(AYS), at *8 (E.D.N.Y. Dec. 1, 2023) (citing *Gore*, 517 U.S. at 581) (cataloging legislative provisions for double, triple or quadruple punitive damages). The jury's determination that treble damages were appropriate here is worthy of consideration, but does not end the analysis.  Since the compensatory award is neither nominal nor insubstantial, the Court is required to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *DiSorbo v. Hoy*, 343 F.3d 172, 187 (2d Cir. 2003) (internal quotations omitted).

3. *Penalties for Comparable Misconduct*

The third *Gore* factor involves comparing the award to "civil and criminal penalties for

comparable misconduct." *Id.* The rationale for this consideration is that, if the penalties for comparable misconduct are much less than a punitive damages award, the tortfeasor lacked fair notice that the wrongful conduct could entail a sizable punitive damages award. *Id.*

Nearly a decade ago, this Court identified a common problem with analyses of this factor: the use of state law criminal provisions as the appropriate point of comparison. *Anderson v. Aparicio*, 25 F. Supp. 3d 303, 312 (E.D.N.Y. 2014), *aff'd and remanded sub nom. Anderson v. Cnty. of Suffolk*, 621 F. App'x 54 (2d Cir. 2015) ("[D]ecisions have uniformly expressed frustration with the use of state misdemeanor criminal penalties as a benchmark for evaluating an excessive force punitive award [because] the conduct defined by these criminal statutes is qualitatively different when committed as an abuse of official authority [and] the relatively modest fines associated with state misdemeanor offenses do not provide a useful benchmark for evaluating punitive awards assessed against law enforcement officers."). *Anderson* posited reference to criminal penalties for civil rights offenses as a useful measure. *Id.* ("Where a jury imposes punitive damages for a violation of § 1983, the penalties imposed under federal criminal law for similar offenses provide an excellent metric for evaluation of excessiveness. And, indeed, federal criminal law offers a highly analogous provision for deprivation of rights under color of law."); *cf. Stratakos v. Nassau Cnty.*, No. 15-CV-7244 (GRB), 2021 WL 2587722, at *13 (E.D.N.Y. June 24, 2021) (explaining that "federal criminal law provides a useful framework" in calculating punitive award for civil rights violations by law enforcement officers).

The Second Circuit has since adopted this approach. *See Jennings*, 18 F.4th at 393 ("Where a jury imposes punitive damages for a violation of § 1983, the penalties imposed under federal criminal law offer a useful comparison."); *see also Magalios v. Peralta*, No. 19-CV-6188 (CS), 2022 WL 407403, at *5 (S.D.N.Y. Feb. 10, 2022) (citing *Jennings* and *Anderson*), *aff'd,*

16

No. 22-519-PR, 2023 WL 4618349 (2d Cir. July 19, 2023).  Thus, in evaluating a punitive

award, the Court looks to 18 U.S.C. § 242 which provides, in relevant part, as follows:

> Whoever, under color of any law, statute, ordinance, regulation, or custom,
> willfully subjects any person in any State [ ] to the deprivation of any rights,
> privileges, or immunities secured or protected by the Constitution or laws of the
> United States [ ] shall be fined under this title or imprisoned not more than one year,
> or both.

This statute carries up to one year of imprisonment (rendering it a Class A misdemeanor) or a

fine of up to $100,000.  18 U.S.C. §§ 3581, 3571(b)(5).  These penalties are substantial, even if

of smaller magnitude than those considered in *Jennings* and *Anderson*, as the conduct here did

not result in any bodily injury.  Additionally, as the Circuit has repeatedly recognized, "criminal

penalties understate the notice when the misconduct is committed by a police officer [because

the defendant officer's] training as a police officer gave him notice as to the gravity of

misconduct under color of his official authority, as well as notice that such misconduct could

hinder his career."  *DiSorbo*, 343 F.3d at 188 (internal quotations omitted).

That the relevant criminal statute provides for a fine of up to $100,000 suggests that the

jury's punitive award of $450,000 (or even the slightly more modest $400,000 recommended by

plaintiff's counsel on this motion) is excessive, weighing in favor of remittitur.  Notably, in *Lee*,

the Second Circuit compared the $200,000 in punitive damages awarded by the jury to the

penalties for a state misdemeanor offense—which imposed up to one year in prison and a $2,000

fine—and concluded that "the maximum fine of $2,000 gives little warning that the offense

could entail a $200,000 civil award."  101 F.3d at 811 (2d Cir. 1996) (reducing the award to

$75,000).  Even considering the more expansive penalty under § 242, the existing penalties do

not provide adequate notice for a $450,000 punitive award.

*Totality of the Gore Factor Analysis*

17

All three *Gore* factors, as well as the reduction of compensatory damages discussed above, suggest that the jury's $450,000 punitive award is beyond the upper limit of reasonableness, calling for a reduction.

"To determine the appropriate level of punitive damages, [the Court] assess[es] such awards in other police misconduct cases." *DiSorbo*, 343 F.3d at 188.  Again, for the reasons noted, *Lee* provides an important benchmark.  In that case, the Second Circuit considered remittitur of a $200,000 punitive damages award on a malicious prosecution claim in a case with important factual similarities to the instant matter.  The Circuit concluded, after applying the *Gore* factors, that a $125,000 reduction was appropriate, leaving a punitive award of $75,000 (approximately $150,000 in 2024 dollars).  Unlike *Lee*, though, in which involved a nominal damages award, here the compensatory damages are more substantial.

Considering all of these factors together suggests a punitive award ranging from an amount equal to the compensatory damages of $77,700, to twice that figure, or $155,400.  Beyond that, in this Court's view, the punitive award would be excessive.  As the Circuit consistently encourages district courts to "'use the least intrusive standard for calculating a remittitur'—namely, 'remitting the jury's award only to the maximum amount that would be upheld by the district court as not excessive,'" *Martinez v. The Port Auth. of New York & New Jersey*, 445 F.3d 158, 160 (2d Cir. 2006) (quoting *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir. 1990)), this Court will adopt the high end of this range—$155,400—as the punitive award.

This figure proves consistent with the guideposts set by *Gore*.  As noted, though not involving violence, the acts giving rise to the malicious prosecution finding are sufficiently egregious to warrant a significant punitive award.  Second, a 2:1 ratio in this case is consistent

18

with the tradition of awarding small multiples of actual damages as a punitive measure, and also helps effect the jury's intent in making a similar award.  The proposed sum is consistent with the notice concerns of the third *Gore* factor, as defendant Tarquinio could have faced a $100,000 criminal fine plus up to a year in jail under federal law for the actions described herein.  Finally, this sum nearly matches the relevant benchmark set by the Second Circuit's decision in *Lee*, which, in current dollars, would amount to approximately $150,000.

Based on the foregoing, defendants' motion for a new trial is granted on the issue of damages unless plaintiff agrees to a remittitur reducing the compensatory damage award to $77,700 and the punitive damage award to $155,400,[11] amounting to a total award of $233,100.

*Suffolk County's Motion Challenging the Monell Verdict*

A week after the jury rendered a verdict against Tarquinio, trial continued concerning plaintiff's claims under *Monell* as against the County, which claims had been bifurcated. Tarquinio was recalled by the plaintiff, and inquiry was made into his background, specifically relating to Internal Affairs investigations.  Tr. 859.  In one instance, Tarquinio had failed to make an arrest and to record required information in a memo book.  Tr. 870.  Another involved his provision of information to an off-duty officer.  Tr. 872.  He was also the subject of two excessive force complaints.  Tr. 876.  He further testified that the police department maintains an

---

[11] In urging this Court to reduce the punitive damage award, counsel for Suffolk County makes the curious argument that "where, as here, the penalized defendant is a government official indemnified by the government entity that employs him, excessive punitive awards can be counterproductive to achieving social goals."  DE 165-9 at 52 (citing *Payne*, 711 F.3d at 95) ("The burden of punitive damages [ ] does not even [ ] fall on the wrongdoer [who] receives indemnification.  [I]t is the taxpaying public that bears the brunt of an excessive award.").  In fact, New York public policy *prohibits* municipal indemnification for punitive damages in a § 1983 action.  *See Suffolk Cnty. Patrolmen's Benevolent Ass'n, Inc. v. Suffolk Cnty.*, 595 F. Supp. 1471, 1480 (E.D.N.Y. 1984), *aff'd sub nom.* 751 F.2d 550 (2d Cir. 1985); *see also Hartford Acc. & Indem. Co. v. Vill. of Hempstead*, 48 N.Y.2d 218, 228, 397 N.E.2d 737 (1979)) ("[W]e conclude that the rule to be applied with respect to a punitive damage award made in a Civil Rights Act action is that coverage is proscribed as a matter of public policy.  We reach that conclusion primarily because to allow insurance coverage is totally to defeat the purpose of punitive damages.").  Since Suffolk County has chosen to indemnify its officers against § 1983 punitive damages awards, in seeming violation of New York's public policy, the County cannot rely on this decision as a basis to reduce such awards.

19

excessive force policy, but he was unaware of any officers disciplined under that policy.  Tr. 919.

Inquiry turned to James Burke, the former police chief of Suffolk County.  Tr. 920;  *see also United States v. McPartland*, 81 F.4th 101, 107 (2d Cir. 2023).  Tarquinio testified, somewhat less than credibly, that he was unfamiliar with the events surrounding Burke's plea of guilty to civil rights violations.  *Id.*  Tarquinio testified that the force he used in arresting plaintiff was consistent with the training provided by and practices of the Suffolk Police Departmen.  Tr. 921.  Plaintiff then offered testimony which, even when competent, was entirely irrelevant.

Next, plaintiff's counsel offered the plea allocution of James Burke, which was admitted over defendant's objection.  Tr. 976.  That allocution relates to Burke's use of excessive force against a detainee.  Plaintiff rested, and defendant offered no further evidence regarding the *Monell* claim.  After a brief deliberation, the jury returned with a verdict, finding that Suffolk County maintained a custom, pattern, practice or policy that led to the deprivation of plaintiff's constitutional rights, answering interrogatories that the County failed to properly train or supervise its employees, and finding ratification of acts of malicious prosecution by a policy maker.  *See* DE 152.

On this motion, the County argues that "[p]laintiff's entire Monell theory is based on a finding of excessive force for which the jury did not find either defendant liable."  DE 165-9 at 49.  As a result, the County argues that plaintiff "has failed to establish by a preponderance of the evidence that a custom, practice or policy of the County resulted in Plaintiff's malicious prosecution by Tarquinio."  *Id.*  Plaintiff makes no response to the argument—effectively abandoning the position—instead arguing that Tarquinio's use of excessive force, which the jury found resulted in no injury, was the result of ineffective training and supervision.  *See* DE 165-21 at 14.  The problem, as defendants correctly argue, is that a searching review of the record shows

20

no evidence supporting the jury's determination as it relates to malicious prosecution.  Nor can plaintiff point to any evidence of ratification of the malicious prosecution by a policy maker.[12]

While the evidence submitted by plaintiff *might* have supported a *Monell* pattern involving the use of excessive force (and it well may not), there is not even a colorable argument that the evidence supports a custom, pattern, practice, policy or ratification that in any way relates to malicious prosecution.  *See Crews v. Cnty. of Nassau*, 149 F. Supp. 3d 287, 296 (E.D.N.Y. 2015) (upholding defendant's verdict where "[p]laintiff did not offer any other evidence to draw an 'affirmative link' between the failure to train and his constitutional injury"); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)) ("At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged.").  Given the freewheeling manner in which counsel conflated these elements throughout both phases of the trial, as well as the reprehensible conduct by defendant Tarquinio that was set on display, the jury's verdict is unsurprising.  It's just not sustainable.

As such, the County's motion for judgment as a matter of law under Rule 50(b) as to the *Monell* verdict is granted.  Pursuant to Rule 50(c), the Court finds that, if this judgment is later vacated, the County would be entitled to a new trial under Rule 59, as the jury's verdict is against the weight of the evidence.

### *Conclusion*

 For the reasons set forth herein:

1.  Defendant Tarquinio's motion for relief under Rules 50 and 59 based upon the purported existence of probable cause or arguable probable cause warranting the application of

---

[12] Though the record shows that others within the County government—such as the detectives and members of the Suffolk DA's office—played a role in the prosecution, based on Tarquinio's descriptions of the incident (later revealed to be apparently false), the charges were not facially specious, and therefore there is no demonstration of ratification.

qualified immunity is DENIED.

2. Tarquinio's motion for a new trial is GRANTED on the issue of damages UNLESS plaintiff agrees to a remittitur reducing the compensatory damage award to $77,700 and the punitive damage award to $155,400, for a total award of $233,100.

3. Defendant Suffolk's motion for judgment as a matter of law as to the *Monell* verdict is GRANTED.

Plaintiff's counsel shall advise defendants' counsel and the Court within ten days of the date of this Order as to whether he intends to accept the remittitur, or if a date should be set for a retrial on damages.

**SO ORDERED.**

Dated: Central Islip, New York
          March 26, 2024

/s/ **Gary R. Brown**
GARY R. BROWN
United States District Judge